Jack B. PHILLIPS, Appellant,

v.

EMPLOYERS MUTUAL LIABILITY IN-
SURANCE COMPANY OF WIS-
CONSIN, Appellee.

No. 16161.

United States Court of Appeals
Fifth Circuit.

Dec. 19, 1956.

Ernest Ralph Gismant, Dallas, Tex.,
for appellant.

Henry D. Akin, Leachman, Gardere,
Akin & Porter, Dallas, Tex., for appellee.

Before RIVES, TUTTLE and
CAMERON, Circuit Judges.

RIVES, Circuit Judge.

Appellee brought suit in the district
court to set aside a final award of the
Industrial Accident Board of Texas en-
tered in favor of appellant on October 27,
1955 and ordering him compensated at
the rate of $25.00 per week, for a period
not exceeding 300 weeks from May 25,
1955, for temporary, total incapacity re-
sulting from a back injury sustained in
the course of his employment with ap-
pellee's insured, Wales Trucking Compa-
ny of Dallas, Texas. Appellant, as de-
fendant below, cross-claimed for perma-
nent, total disability. The district court,
trying the case without a jury, upset the
Board's award in toto, expressing infor-
mally from the bench its findings and con-

clusion that no compensation was allowable.[1]

■ On the merits [2] appellant's main insistence is that the testimony introduced in his behalf requires reversal of the district court's finding that the proof fails to show any degree of compensable incapacity. He mainly relies upon excerpts from his own testimony and that of his medical expert, Dr. Ben Schoolfield, as establishing the permanent nature of his injury, and the fact that it is unrelated to the pre-existing disability for which he was pensioned by the Government or any possible disability resulting from a congenitally deformed back.[3]

1. In its usual oral opinion delivered at the conclusion of the trial, the district court stated:

"I find as facts, Gentlemen, that the defendant and cross-plaintiff, Phillips, was an employee of the hauling company, and that when he went to work for that company, he had already been a soldier in the United States Army, and had suffered, and was suffering, from a disability which may or may not have originated in the army, but for which the United States was paying him $130.00, I believe it is, per month, which was a grant of such payment as he was entitled to as a soldier, both for himself and his wife and little family; that while suffering a disability, he also had from birth; a congenital disability; in his back which had persisted, and still persists; but that disability was his when he went to work for this company, and any increase in that disability would bring a reward to him, if in fact he suffered a disability, or the original disability in the war; but I find as further facts, Gentlemen, that after he had been working for this company some time, he complained of having been hurt, during which time the insurance company paid him compensation; that after the expiration of those payments, he went back again to work, and made a much larger sum of money than he was earning, or had been earning, and that that work was driving a truck long distances and loading and unloading the freight which he carried and brought on that truck.

"I believe, Gentlemen, that it is justice under these facts which I have found, and in which the attorneys have no disagreement, that he has been paid for such muscle strain as he claims to have originally received, and that that strain, muscle strain, had ceased when he went back to work and made this additional compensation in his original work. I cannot, as a conclusion of law, find that the cross-action plaintiff is entitled to recover anything, Gentlemen."

2. We pretermit discussion of the jurisdictional issue raised by appellee's motion to dismiss for appellant's late filing of the record and brief on appeal. Exercising the broad discretion vested in this Court by Rule 73(a), Federal Rules of Civil Procedure, 28 U.S.C.A., we simply hold that appellant's failure in these respects to show strict compliance with Rule 73 (g)' and this Circuit's Rule 24, 28 U.S. C.A., are at most non-jurisdictional defects in the prosecution of his appeal, which we consider insufficient to warrant dismissal. See Martin v. Handy-Andy Community Stores of Texas, 5 Cir., 214 F.2d 10, 11; Columbia Lumber Co. v. Agostino, 9 Cir., 184 F.2d 731, 733; cf. Fong v. James W. Glover, Ltd., 9 Cir., 197 F.2d 710, 712.

3. Dr. Schoolfield, a specialist in Bone and Joint Surgery, who had not treated appellant, but examined him for the purpose of testifying, described appellant's injury as follows:

"Q. (By Mr. Gismant) Would you take these (X-rays) and very briefly tell what they show, please sir?

"A. Well, the main thing that it shows is a reduction of the lumbosacral joint, that is produced throughout its entire extent forward and backward, and the facets are overriding, laminae are narrowed, reduced, and the same thing was showed in the plates made yesterday.

"The Court: All right.

"Q. (By Mr. Gismant) Would you tell the Court the significance of that, please, sir?

"A. Well, it means that if that joint had been damaged, and there had been a settling at that point—in other words, the spine is settled down and has become narrowed at the lumbosacral joint due to the material there having escaped out of the lumbosacral disc.

"Q. I will ask you, Doctor: Have you an opinion, based upon a reasonable medical certainty, as to whether or not the condition you have observed, herein described, the X-ray film, have you an opinion, based upon reasonable certainty, as to the permanency of this condition, sir?

"A. Yes, sir.

"Q. What is that, sir?

"A. I think it is a permanent injury.

He further complains of the trial court's finding that he had already been amply compensated for his "muscle strain" by the $150.00 payment admittedly received by him from appellee subsequent to his injury; and particularly of the trial court's statement in overruling his motion for new trial that "he has been back to work ever since", which he insists is contrary to the undisputed evidence showing that he attempted to resume his employment duties on July 8, 1955, after a six week's lay-off caused by his injury, but was forced to quit his employment with Wales Trucking Company on August 26, 1955 and had been unable to work since that date.

On this main issue as to the sufficiency of the testimony to support the court's findings, appellee insists that acceptance of appellant's evidentiary argument would necessarily require rejection of that portion of the testimony credited by the trial court,—namely, the proof showing that, following the six week's period of disability after appellant's injury for which he was admittedly compensated, he suffered no further compensable loss of wage-earning capacity from his injury, since he returned to work on July 8, 1955 and earned nearly $800.00 from then until August 26, 1955 when he left his employment; that during such period he had loaded heavy freight, driven on long trips, and showed no sign of any injury or disability to his co-workers, performing his usual duties in a completely satisfactory manner. Appellee further quotes from the testimony of its only medical witness, Dr. Alexander, as supporting the court's conclusion that, regardless of appellant's claimed inability to work since the date of his injury,[4] he had suffered only a temporary loss of wage earning capacity from a "sacro-iliac strain",[5] and had sustained no permanent injury.

"Q. You do, sir. I have one more question, Doctor. Doctor, if you assumed that this man is thirty-one years old, assumed that he was on a truck attempting to push back a steel casing some thirty feet long, and assumed that in so doing, he has injured his back, and assumed that these other facts which you testified to and which are shown by the X-ray, could you render an opinion as to whether or not that was a producing cause of the injury that he now complains of?

"A. Well, I would think so, unless he had something before that time.

"Q. I see. In looking at the X-rays, do they indicate anything, any prior condition that might affect this?

"A. I don't think so.

   *    *    *    *    *

(On cross-examination)

"Q. And you did find a congenital condition in his back? That is a weakening condition, isn't it, Doctor?

"A. Well, some people might so regard it. I don't pay much attention to it, unless it is associated with evidence of injury.

"Q. But you say that the congenital condition was there when you saw him in July?

"A. Yes, we see that in a good many people."

4. Appellee points out that counsel for appellant objected to the court's probably inadvertent but erroneous comment upon the court's denial of the motion for new trial, that appellant "has been back to work ever since." It notes that, in spite of such objection, the court still emphatically adhered to its view that the testimony did not justify any award.

5. Though the qualifications of Dr. Nelson Alexander to testify as an expert witness were severely attacked because he was an osteopath rather than an M.D., he testified as follows:

"Q. Now, Doctor, did you find any fractures or breaks or dislocations in the back when you X-rayed it?

"A. No sir.

"Q. Did you find any strain of any muscles when you examined it?

"A. Yes sir.

"Q. And what was your diagnosis at that time, Doctor?

"A. As a severe—rather severe—sacro-iliac strain.

"Q. Is that a strain of the muscles?

"A. Yes, sir, a strain of the muscles, which was—that was just a bald diagnosis of sacro-iliac strain, which comes back again to this congenital deformity which left it liable to be strained."

■■ We think that enough of the conflicting testimony has now been set forth to justify our conclusion that only a routine factual dispute as to the existence, severity and duration of appellant's injury causing incapacity was presented, and that the trial court's resolution of such factual dispute was clearly within its province, as initial fact-finder, with the better opportunity to pass upon the credibility of the witnesses. While we confess some misgivings as to the result, engendered largely by the uncommon disparity in qualifications of the medical witnesses,[6] we still cannot hold from our full reading of the record that the trial court's findings should be reversed as "clearly erroneous." Rule 52(a), F.R.C.P.; California Insurance Company v. Allen, 5 Cir., 235 F.2d 178.

■ That there was no error in the trial court's refusal to grant a new trial for alleged newly discovered evidence seems to us a conclusion too clear for elaboration. If we assume that such evidence was actually newly discovered, and could not have been produced by due diligence at the trial,—inferences not fairly conveyed by this record,—the Moore and Broadway affidavits, at most, could have only a cumulative effect for purposes of impeaching the testimony of appellee's witness, Travis, and in all probability would not produce a different result. Clearly, there was no reviewable abuse of discretion in the trial court's denial of the motion for new trial upon this ground. English v. Mattson, 5 Cir., 214 F.2d 406, 409.

Affirmed.

6. Unlike Dr. Alexander, the Company osteopath, Dr. Schoolfield, appellant's medical witness, apparently possessed eminent qualifications as a specialist in Bone and Joint Surgery. As heretofore noted, however, in footnote (3), supra, Dr. Schoolfield merely examined appellant for the purpose of testifying in his behalf, and, in fact, admitted on cross-examination that he often testified as a medical expert for plaintiffs. In any event, the trial court, who had heard this witness testifying many times previously and had the superior opportunity to pass upon his credibility in this instance, chose to reject his and appellant's testimony, and, of course, such testimony was not binding upon the court.